**UNITED STATES of America,
Plaintiff-Appellant,**

*v.*

**VALDOSTA–LOWNDES COUNTY HOSPITAL AUTHORITY,
Defendant-Appellee.**

**No. 80–9078.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 24, 1983.

Susan J. Herdina, Atty., William Kanter, Civ. Div., Dept. of Justice, Washington, D.C., Chris Pascal, Dept. of Health & Human Services, Rockville, Md., for plaintiff-appellant.

John R. Bennett, Valdosta, Ga., for defendant-appellee.

Before HILL, VANCE, Circuit Judges and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

The United States appeals from judgment based on a jury verdict in favor of the defendant in a case in which the government contends that the trial court erred in not directing a verdict in its favor. The action was brought by the United States seeking a refund of a proportionate part of a grant of $412,929.93 to the appellee for the purpose of the construction of a facility to be used for the South Health District Comprehensive Community Mental Health Center. The alleged basis of the claim for recovery is that within a 20 year period from the date of the grant the facility was no longer used for the purpose for which the grant had been made by the United States.

The appeal is complicated by the fact that although the United States contends that the evidence was undisputed that entitles it to a recovery and although the government made a motion for directed verdict before presentation to the jury, it did not file a motion for a judgment notwithstanding the verdict within 10 days after judgment as provided by Rule 50(b) F.R.C.P.

We consider this procedural issue first. The appellant concedes that where a party fails to move for j.n.o.v. following a jury verdict, that party may not, by establishing that there was in fact insufficient evidence for the case to go to the jury, obtain a mandate from an appellate court directing the entry of a judgment in its favor. The available remedy to such a party has recently been discussed by this Court in *Jackson, et al. v. Seaboard Coast Line Railroad Co., et al.*, 678 F.2d 992 (11th Cir. 1982). There this Court said:

On appeal, appellees urge that we remand the case for a new trial because the district court erred in not directing a verdict on the issue of appellees' qualifications to serve as carmen. Their failure to file a motion for JNOV is not fatal to their appeal. A party's failure to move for JNOV does not preclude appellate review of an earlier motion for a directed verdict. However, where a motion for

JNOV has not been filed, the only relief a party may obtain in this court is the ordering of a new trial; we may not direct a district court to enter judgment for the appellant. *See Gorsalitz v. Olin Matheson Chemical Corp.,* 429 F.2d 1033 (5th Cir.1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *Yorkshire Indemnity Co. of N.Y. v. Roosth & Genecov Production Co.,* 252 F.2d 650, 657–58 (5th Cir.1958).

678 F.2d at 1021.

The standard of review thus announced places on us the obligation to determine whether the trial court erred in not granting the United States' motion for directed verdict. If we find that it did, then the remedy available to the government is, as it now requests, a new trial.[1]

We now turn to the state of the record at the time the United States moved for a directed verdict. It is undisputed that the United States advanced the sum of $412,-929.93 in response to an application which contained a proviso designated "O" that:

the services to be provided by the facility, alone or in conjunction with other facilities *owned or operated by the applicant* will be made available for a program providing principally for persons residing in a particular community or communities in or near which such facility is to be situated. At least the essential elements of comprehensive medical health services, *i.e.,* inpatient services, outpatient services, partial hospitalization services (including at least day care services), emergency services provided 24 hours per day within one or more of the above services, and consultation and education services available to community agencies and professional personnel. (emp. added)

Following the construction of the building, its first floor was occupied by professional, but non medical, personnel, including psychologists and psychological therapists and other professionals with professional qualifications to deal with the mentally ill. At the same time, the second floor of the building was occupied by the grantee, the Hospital Authority, to serve mental patients of the medical doctors who formed its staff. None of the non medical personnel engaged in the operation of the so-called "community mental health center" were permitted to serve their patients once they were admitted as inpatients by a member of the hospital staff.[2]

---

1. Our difficulty in understanding the reason for this rule is well illustrated by an opinion authored by Judge Maris of the Court of Appeals for the Third Circuit in which he said:

> If the defendant after judgment had moved for judgment in its favor in accordance with its motion for directed verdict we could remand the case with directions to enter judgment for the defendant. Such a motion not having been made, however, the case must be remanded for what under the circumstances would appear to be the useless formality of another trial.

*Garman v. Metropolitan Life Insurance Co.,* 175 F.2d 24, 28 (3d Cir.1949).

2. Regulations § 54.212 were applicable here: 42 C.F.R. § 54.212 (1975), as reprinted in 42 C.F.R. Part 54, Appendix B (1981) (45 F.R. 48493, 48495, July 18, 1980), states:

> § 54.212 *Projects: essential elements of comprehensive mental health services; program requirements.*
>
> (a) *Essential elements of comprehensive mental health services.* The essential elements of comprehensive mental health services are:
>
> (1) Inpatient services.
>
> (2) Outpatient services.
>
> (3) Partial hospitalization services-must include at least day care service.
>
> (4) Emergency services provided 24 hours per day must be available within at least one of the first three services listed above.
>
> (5) Consultation and education services available to community agencies and professional personnel.
>
> (b) *Services of facility as part of a program.* To the extent that the services to be provided within the proposed facility do not constitute a program providing at least the essential elements of comprehensive mental health services, the application shall demonstrate to the satisfaction of the Surgeon General that the services to be provided within the proposed facility will be part of such a program (as described below).
>
> (c) *Criteria of program.* As used in the section, a program for providing at least the essential elements of comprehensive mental health services must take into consideration the needs of all age groups, assure continuity of care for patients and assure that the relationship between the individual elements of the services meets the following criteria:

Some 18 months after the opening of the facility, by reason of separate federal legislation, a "staffing" grant was allocated for the payment of at least some of the persons engaged in the operation of the mental health center. Thereafter, the inpatient facilities and the emergency services, with such limitations as mentioned above, continued in the facility for several years, with the remaining services being performed under the aegis of the Georgia State and/or Lowndes County Health Department, through which the staffing grants were funded. While the record does not really show the exact extent to which all five required services were being performed in this manner until the complete breach in 1976, the government does not contend that there would be no basis for the jury's determination that such services were provided up to that date. It is to be noted, however, that whatever services that were performed by the Community Mental Health Center other than the inpatient and emergency services were not performed in any "facilities owned or operated by the applicant" (Valdosta-Lowndes County Hospital Authority). These activities were carried on at other places in other buildings both in the City of Valdosta and in other centers, some of which were as much as 40 miles distant.[3]

On February 28, 1975, a letter was written to the Hospital Authority following an on-site evaluation by the regional office of the Department of Health and Human Services' regional office in Atlanta. This letter specifically cited deficiencies in the Center's inpatient services and in the comprehensiveness of the services offered by the Center. The letter notified the Authority that it must take remedial action to bring the Center into compliance with the terms of the construction grant or, in lieu of such compliance, repay the federal government its proportionate share of the value of the facility. Following meetings between the Department and the appellee, the latter, on January 30, 1976, wrote to the Department stating its willingness to appoint appraisers and make a refund of the proportionate value of the facility represented by the government's participation in the original building costs.

Still, nothing was done of a concrete nature until the director of the Community

(1)(i) That any person eligible for treatment within any one element of service will also be eligible for treatment within any other element of service;

(ii) That any patient within any one element can and will be transferred without delay to any other element (provided that adequate space is available) whenever such a transfer is indicated by the patient's clinical needs;

(iii) The clinical information concerning a patient which was obtained within one element [will] be made available to those responsible for that patient's treatment within any other element;

(iv) That those responsible for a patient's care within one element can, when practicable and when not clinically contraindicated, continue to care for that patient within any of the other elements; and

(v) In cases where two or more of the individual elements of services are provided by different organizations, agencies, or persons, the relationships between the individual elements must be evidenced by appropriate contracts or other formal written agreements (copies of which must accompany the application) among the various organizations, agencies, or persons which make specific provisions for assuring compliance with the criteria set forth in this section.

(2) The medical responsibility for each patient will be vested in a physician. Psychiatric consultation must be available on a continuing and regularly scheduled basis, not less than once weekly.

(3) The overall direction of a center may be carried out by a properly qualified member of any one of the mental health professions.

(4) That general practitioners and other non-psychiatric physicians in the community served by the program will be allowed, when qualified, to follow and assist in the care of their patients on the various services of the program provided they are working under the supervision of a member of the psychiatric staff of the service.

(5) That the services of the program will not be denied to any person residing within the area served solely on the ground that such person does not meet a requirement for a minimum period of residence in such area.

3. The only inpatient service which fully satisfied the requirements of the comprehensive mental health program requirement seems to have been in a hospital some 43 miles distant from the Valdosta Hospital.

Medical Health Center, whose offices at that time were in the hospital's facility, packed up his office equipment and left the building completely. Thereupon, the Department notified the Hospital Authority that it was demanding a reimbursement under the terms of the government's grant. Upon a failure of the Hospital Authority to make payment, the government filed this action.

While there might otherwise be some dispute as to the quality or efficacy of the program for the treatment of mentally disturbed persons in the Valdosta area, originally consisting of five counties later enlarged to 10 by state action, there can be no doubt that the services comprehended by the application for the grant were not provided either in or by Lowndes County-Valdosta Hospital Authority, the grantee. At the trial, the vice chairman of the board of the Hospital Authority was asked the following question: "In 1980, up to this time, is the hospital providing all five essential services at South Georgia Medical Center?" To this question, he answered: "No, sir, we are not."

Likewise, the executive director of the hospital testified at the trial. In answer to the question: "Is there a community mental health center being operated out of the South Georgia Medical Center today?", Mr. Barnes answered: "Not the way it's written in here [referring to the application form], some of the services are being carried out." Mr. Barnes further testified that the Hospital Authority had moved its other activities into the space originally occupied by the personnel operating the mental health center, after the latter had moved out in July of 1976.

In its brief here, the Hospital Authority portrays the issues before the court in the following terms: "... two of the essential services were provided by appellee in conjunction with the Health Department. It is clear that appellee continues to provide those two services and the Health Department provides the remainder. The only conflict in the evidence is whether those services are being provided in a manner which technically complies with the judgment of certain government officials...."

Of course, that is not the question. It is, rather, whether the services are being provided in the manner agreed upon between the United States and the Hospital Authority at the time the latter received the $412,-929.93 grant to build the facility. As to this, there is no conflict in the evidence. As a result, the Hospital Authority has a two story building for which half of the cost was paid by the government, no part of which is used for the purpose for which the grant was made but which is all available to the Hospital Authority for its general hospital uses. It is understandable, under these circumstances, why the application form included certain conditions that must be complied with in default of which the government would be entitled to a reimbursement of a proper proportion of the money it had advanced for its construction. This right is created under 42 U.S.C. § 2695 (1975), the statutory section which was in effect at the time of the granting of the funds to the Hospital Authority.[4] Title 42 U.S.C.

4. This section provides as follows:

If any facility or center with respect to which funds have been paid under section 2693 of this title shall, at any time within twenty years after the completion of construction—

\* \* \* \* \* \*

(2) cease to be a public or other nonprofit facility for the mentally retarded or persons with other developmental disabilities or community mental health center, as the case may be, unless the Secretary determines, in accordance with regulations, that there is good cause for releasing the applicant or other owner from the obligation to continue such facility as a public or other non-profit facility for the mentally retarded or persons with other developmental disabilities or such center as a community mental health center, the United States shall be entitled to recover from ... the owners thereof an amount bearing the same ratio to the then value (as determined by the agreement of the parties or by action brought in the district court of the United States for the district in which the center is situated) of so much of such facility or center as constituted an approved project or projects, as the amount of the Federal participation bore to the cost of the construction of such project or projects. Such right of recovery shall not constitute a lien upon such facility or center prior to judgment.

§ 2689m (1981) provides the same relief for the United States under similar circumstances in slightly different language.

Simply put, the statute contemplates a situation whereby a state department of health in cooperation with a local county health department, being concerned for the treatment of the mentally ill persons in the area, can find a general hospital that is willing to make application for the construction of a substantial addition in which, as a "facility," there will be conducted a comprehensive community mental health service. The hospital under these circumstances could then apply for the funds and obtain one-half the cost of building the facility. In the event the hospital should at any time in the future, short of 20 years, abandon the use of its space for the stated purpose or, in the event that persons involved in performing the mental health services for the community are persuaded by any other organization, including the state and/or county departments of health to set up a different system, and they abandon the facility in pursuing that objective, the hospital as original applicant for the grant has available to it the space in the facility, so largely contributed to by government funds, for its other uses and purposes as a general hospital. Under such circumstances, the law contemplates that the hospital shall reimburse the government its share of the current value of the facility as represented by the proportion it paid to help build it in the first place.

The only case we have found that expressly deals with this recovery section of the federal statute is *United States v. Lutheran Medical Center,* 680 F.2d 1211 (8th Cir.1982). In that case, the trial court had recognized the right of the United States to make the recovery under circumstances such as existed here, and then addressed its attention to the appropriate statute of limitations. Relying upon an earlier decision of the Court of Appeals for the Fifth Circuit, *United States v. Palm Beach Gardens,* 635 F.2d 337 (5th Cir.1981), the Eighth Circuit concluded that there being no statutory period prescribed in the statute, the United States could proceed at any time to seek its reimbursement from the local grantee. The *Palm Beach Gardens* case involved reimbursement of funds under a different statute, the Hill-Burton Act, 42 U.S.C. § 291i, an analogous provision for recovery of federal funds used in the construction of a non-profit hospital, which use was later abandoned. It also dealt only with the statute of limitations point.

■ It being apparent that prior to the filing of this action, the facility was no longer being used for the purpose for which it was built, it then follows as a matter of law that the government was entitled to recover. It was therefore error for the trial court to deny the motion for directed verdict. However, as outlined above, the government here asks only for a new trial, since the power of this Court is limited to that relief.

The judgment is REVERSED and the case is REMANDED to the trial court for further proceedings not inconsistent with this opinion.