B–T LIMITED, a Wyoming limited partnership; E.B. Tatman, a general partner of B–T Limited; and Triple R Limited Partnership, a Wyoming limited partnership; and D.E. Tatman, a general partner of Triple R Limited Partnership; Appellants (Plaintiffs),

v.

Kenneth BLAKEMAN and Fern Blakeman, husband and wife, Appellees (Defendants and Third-Party Plaintiffs),

v.

Robert V. CORDINGLY and Gary Lee Cordingly, Judith C. Cordingly, Virgil R. Cordingly, and Lowella M. Cordingly, (Third-Party Defendants).

Robert V. CORDINGLY and Gary Lee Cordingly, Judith C. Cordingly, Virgil R. Cordingly, and Lowella M. Cordingly, Appellants (Third-Party Defendants),

v.

Kenneth BLAKEMAN and Fern Blakeman, husband and wife, Appellees (Third-Party Plaintiffs and Defendants),

v.

B–T LIMITED, a Wyoming limited partnership; E.B. Tatman, a general partner of B–T Limited; and Triple R Limited Partnership, a Wyoming limited partnership; and D.E. Tatman, a general partner of Triple R Limited Partnership; (Plaintiffs).

Nos. 84–229, 84–230.

Supreme Court of Wyoming.

Aug. 7, 1985.

Lawrence A. Yonkee of Redle, Yonkee & Arney, Sheridan, for appellants B–T Limited, Triple R Limited Partnership, E.B. Tatman, and D.E. Tatman.

Thomas S. Smith of Smith, Stanfield & Scott, Laramie, for appellants Robert V. Cordingly, Gary Lee Cordingly, Judith C. Cordingly, Virgil R. Cordingly and Lowella M. Cordingly.

Timothy J. Kirven of Kirven & Kirven, Buffalo, for appellees Kenneth Blakeman and Fern Blakeman.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

BROWN, Justice.

In a three party transaction involving the exchange of ranches, Kenneth and Fern Blakeman received title to a ranch known as the Upton Ranch. They made a $48,000 down payment and gave a promissory note and mortgage to Tatmans to secure the balance owed on the purchase price. The Blakemans did not make the first payment due on the note, so the Tatmans foreclosed the mortgage and the property was sold at a foreclosure sale for less than the amount due on the note.

The Tatmans sued the Blakemans for a deficiency. The Blakemans defended, contending that they gave a deed back to the Tatmans in satisfaction of the amount due on the note. The Blakemans cross-claimed

against Cordinglys, third-party defendants, demanding reimbursement of the $48,000 down payment that they gave Tatmans, contending that they (Blakemans) were only agents of Cordinglys. A jury decided in favor of the Blakemans on both the Tatmans' deficiency complaint and their cross-complaint against Cordinglys.

The Tatmans appeal the adverse verdict and judgment on their complaint and raise the following issues:

## I

"A. Where the Defendants claimed that Plaintiffs accepted a deed for mortgaged property in full satisfaction of a promissory note made by the Defendants, was it error to refuse to instruct the jury regarding the principles of law applicable to the delivery and acceptance of deeds of conveyance?

"B. Were the Plaintiffs entitled to judgment notwithstanding the verdict for the balance due on the promissory note, where the makers admitted execution and delivery of the note but claimed that Plaintiffs accepted a deed to satisfy the obligation, although Plaintiffs notified

Defendants that they did not accept the deed, foreclosed and brought an action for the deficiency after foreclosure?"

The Cordinglys appeal from the verdict and adverse judgment against them on the Blakemans' cross-claim and raise the following issues:

## II

"Whether the evidence supports the finding of the jury that the Cordinglys agreed to reimburse the Blakemans for the $48,000 down payment paid to Tatmans and assume and pay the annual installments on the promissory note?

"Whether the lower Court erred in refusing to give an instruction relative to the Statute of Frauds?

"Whether the lower Court erred in granting prejudgment interest to the Blakemans?

"Whether Blakemans took reasonable steps to mitigate their damages?"

We will reverse and remand both the Tatman-Blakeman and the Cordingly-Blakeman cases.

CAST

| | |
|---|---|
| E.B. (Ben) Tatman | Appellant |
| a general partner of B–T Limited | |
| D.E. (Dale) Tatman | Appellant |
| a general partner of Triple–R Limited | |
| Robert V. Cordingly | Cross–Appellant |
| Gary & Judith Cordingly | Cross–Appellants |
| Virgil & Lowella Cordingly | Cross–Appellants |
| Kenneth & Fern Blakeman | Appellees |
| Lowham Associates | Sales Agents |

Ben and Dale Tatman are brothers engaged as partners in the ranching business (hereinafter referred to as "Tatmans").

Lowella Cordingly is the wife of Virgil Cordingly. Robert Cordingly and Gary Cordingly are the sons of Virgil and Lowella Cordingly; Judith Cordingly is the wife of Gary Cordingly (hereinafter collectively referred to as "Cordinglys"). Fern Blakeman is the sister of Virgil Cordingly. (Fern Blakeman and Ken-

neth Blakeman, husband and wife, hereinafter referred to as "Blakemans").

The Tatmans owned a large ranch northeast of Rock River, Wyoming, and the Cordinglys owned ranches in Moorcroft, Upton and Wheatland. The Tatmans and Cordinglys agreed to make a tax free exchange of ranches. According to their agreement the Tatmans conveyed their ranch to the Cordinglys. In exchange, two Cordingly ranches were conveyed to the Tatmans, and the Upton ranch was con-

veyed to the Blakemans. In the agreement between the Tatmans and the Cordinglys there was a provision that the Blakemans could purchase the Upton ranch. In this case we are only concerned with this latter transaction, that is, the conveyance of the Upton ranch.

At the time these several conveyances were accomplished, the Blakemans gave Tatmans a $48,000 down payment and accepted a warranty deed for the Upton ranch. They also gave a promissory note to the Tatmans for $144,000 and executed a purchase money mortgage. All documents from these transactions, including the closing statement, were dated December 10, 1980. Both the mortgage and warranty deed on the Upton ranch were recorded in Weston County on December 15, 1980.

Trouble surfaced when the first installment of $17,165.19 on the note from the Blakemans to the Tatmans was about to become due. Dale Tatman contacted the Blakemans relative to the payment. Blakemans informed Dale Tatman in December of 1981 that they would be unable to make the payment. The Blakemans' position was that neither the Upton ranch nor the note and mortgage were their obligations and they had acted at the closing only as agents for the Cordinglys. Upon the Cordinglys' denial that the Blakemans had acted as their agents, and after attempts by the Blakemans to resell the Upton ranch, the Blakemans left a warranty deed with Edward Halsey, attorney for the Tatmans, hoping to be completely released from the obligation of the note and mortgage.

After an attempt to reinstate ownership rights to grazing permits appurtenant to the Upton ranch, the Tatmans refused to accept the warranty deed from the Blakemans, and commenced an action in foreclosure with the right to pursue the collection of any deficiency. The ranch was sold at a foreclosure sale for $70,000, and this action was subsequently commenced by the Tatmans against the Blakemans for a deficiency. The Blakemans joined the Cordinglys as third party defendants praying for indemnification for any damages they might be required to pay the Tatmans, and seeking reimbursement of the $48,000 down payment. The matter was tried to a jury which entered the following verdict:

"1.  Q:  Did the Tatmans accept a warranty deed from the Blakemans in satisfaction of the promissory note made by the Blakemans?

"A:  Yes_X_  No___

"2.  Q:  Did the Cordinglys agree to reimburse the Blakemans for the $48,000 down payment paid to the Tatmans and assume and pay the annual installments owed on the note?

"A:  Yes_X_  No___

"If you answer question # 2 'yes', go on to question # 3.

"3.  Q:  Could the Blakemans have taken reasonable steps under the circumstances to reduce the damages?

"A:  Yes__  No_X_

"If you answer question # 3 'yes', go on to question # 4.

"4.  Q:  What amount could have been saved if such reasonable steps were taken?

"A:  $_____"

The court entered judgment on the verdict on May 31, 1984, and ordered prejudgment interest to be paid by the Cordinglys to the Blakemans. A motion for judgment notwithstanding the verdict and for a new trial was filed by Tatmans and denied by the court. The Tatmans filed notice of appeal and the Cordinglys filed a cross appeal.

## I

### A

Appellant Tatmans' first assignment of error centers around the court's failure to instruct the jury "regarding the principles of law applicable to the delivery and acceptance of deeds of conveyance." The first installment on the Blakemans' note to the Tatmans was due January 2, 1982. Before that time the Blakemans had taken the position either that they could not pay the note or that the obligation was the Cord-

inglys, which the Cordinglys dispute in their appeal.

Shortly before January 2, 1982, Dale Tatman talked with the Blakemans about the payment that was about to become due. As an alternative to foreclosure they talked about a deed back from the Blakemans to the Tatmans. They also talked about the Blakemans trying to find a buyer for the ranch. There was further discussion about the Tatmans accepting a deed to the ranch in a conference call among Mr. Blakeman, the Tatmans and the latter's attorney, H.M. MacMillan. Later Mr. MacMillan referred the Tatmans to Edward S. Halsey, a Newcastle attorney.

Before February 9, 1982, Mr. Halsey prepared a deed from the Blakemans to the Tatmans. This deed was prepared in advance because the referring lawyer, Mr. MacMillan, had suggested that perhaps the Tatmans and Blakemans might settle their problem by Tatmans accepting a deed from the Blakemans on the Upton property. On February 9, 1982, the Blakemans and Mr. and Mrs. Ben Tatman met in the office of Mr. Halsey. Again, there was discussion about the Blakemans giving a deed to the Tatmans in order to settle the mortgage foreclosure problem, but nothing was resolved.

Before the Blakemans left Mr. Halsey's office they signed the deed and left it in the office. At trial Mr. Halsey testified that he explained to the parties the significance of signing and leaving a deed in his office:

"I explained to the parties that—I told the parties that there were two, two aspects of creating validity in a deed, one was the actual signing and acknowledging of the signing of the deed and the delivery of the deed, and that if the deed was going to be left with me it could not be considered as delivered and that at some later date both parties would have to authorize my delivery of the deed. I said that a couple of times to make sure that the parties understood that."

The deed signed by the Blakemans remained in Mr. Halsey's possession until trial. There were no instructions regarding disposition of the deed. After the February 9 meeting between the Tatmans and the Blakemans, a memorandum purporting to settle the Tatman-Blakeman controversy was prepared by Mr. Halsey, but never signed by either party. On February 10, 1982, Ben Tatman presented a copy of the deed to the Inyan Kara Grazing Association. Mr. Tatman said this was "to try to save the forest permits, the grazing permits." Some of the permits were saved and some were lost. Tatman paid grazing fees on the Upton ranch for 1982. Sometime after February 10, 1982, Ben Tatman met with a prospective buyer in Mr. Halsey's office, but nothing came of this possible sale.

On appeal, the issues set out by the Tatmans revolve around the legal significance of the Blakemans leaving a deed to the Upton ranch in the office of the Tatmans' attorney.

The trial court set out the issues between the Tatmans and the Blakemans in Instruction No. 2:

"The Blakemans admit the signing and delivering of the note but claim that the Tatmans accepted a deed for the mortgaged property in full satisfaction of the note and that the Blakemans do not owe the Tatmans any sum."

In Instruction Number 4 the court stated:

"An accord and satisfaction is a new contract which discharges the rights and obligations created by a previous contract.

"There can be no accord and satisfaction unless both parties understood or should have understood as reasonable persons that, by accepting the terms of the new contract, their rights and obligations under the previous contract would be cancelled."

The Tatmans offered the following instruction, which was refused by the court:

"Instruction No. H

"For a deed to be operative as a transfer of the ownership of land it must be deliv-

ered. It is delivery that gives the instrument force and effect.

"Delivery of a deed requires that there be a manifestation of the unequivocal intention of the person who signed the deed to give up all control over the deed to have it become effective as a transfer of title to the land so as to deprive him of all authority over it or the right of recalling it. An acceptance on the part of the grantee is essential to complete the delivery of a deed.

"A deed cannot operate to release the grantor from a debt due to the grantee unless and until the grantee accepts the deed.

"The requirements for acceptance are (1) knowledge that the instrument is tendered for delivery; (2) an intention to take the legal title to the property which the deed purports to convey, and (3) the manifestation of such intention by some act, conduct or statement."

In Instruction No. 2 the court identified an issue between the Tatmans and the Blakemans, that is, did the Tatmans accept a deed for the mortgaged property? However, the court failed to instruct on this issue. Instruction No. 4, accord and satisfaction, alludes to the issue between the Tatmans and Blakemans, but accord and satisfaction or a new agreement were not specified as issues. This instruction would not help the jury resolve the issue and may, in fact, have been confusing.

■ We hold that the jury should have been instructed on the elements of delivery and acceptance, or that these terms should have been defined. In real property law "delivery and acceptance" are words of art and have a meaning different than that ordinarily understood by those not trained in the law of conveyances. *Rothney v. Rothney,* 41 Cal.App.2d 566, 107 P.2d 294 (1940). Absent a definition of delivery and acceptance the jury was free to consider these terms according to their own understanding, which was likely to be far different than the meaning of delivery and acceptance in the law of conveyances.

■ In a conveyance of real property the unilateral action of the grantor manually giving the deed to the grantee or his agent is insufficient. There are two essential elements to a legally binding delivery: 1) transferring possession of the deed by the grantor, and 2) acceptance of the deed by the grantee.

■ Transferring, giving, or surrendering the deed by the grantor to the grantee contemplates parting with possession of the deed with the intent that the deed is to become presently operative as a conveyance and pass title. *Larsen v. Morrison,* S.D., 293 N.W.2d 468 (1980); *Jones v. Young,* Tex.Civ.App., 539 S.W.2d 901 (1976); 23 Am.Jur.2d, Deeds § 123 (1983).

" * * * The requisites of acceptance are the grantee's knowledge of delivery or tender of the deed, an intention to take the legal title to the property which the deed purports to convey, and the manifestation of such intention by some act, conduct, or declaration. * * *

"Acceptance is primarily a matter of the grantee's intention; hence the significant inquiry is as to his intention as manifested by his words and acts. Express words and positive acts are not necessary; intention to accept may be inferred from such conduct as retaining possession of the deed, conveying or mortgaging the property, recording the deed, or otherwise exercising the rights of an owner * * *." 23 Am.Jur.2d, Deeds § 175, p. 196 (1983).

"Actual possession of the deed by the grantee is not essential to, nor does it necessarily indicate, his acceptance thereof, although it may be indicative of acceptance. * * *" 23 Am.Jur.2d Deeds § 176, pp. 196–197 (1983).

■ The "acceptance" of a deed, like that of its delivery, is a matter of intention, to be determined by acts and words of both the grantor and grantee. *Fitzpatrick v. Layne,* 291 Ky. 523, 165 S.W.2d 13, 17 (1942). The delivery of a deed is the act by which the grantor divests himself, and the acceptance of the deed is the act by which

the grantee vests himself with title to the property.

The Blakemans do not contend that the instruction offered by the Tatmans on delivery and acceptance was an incorrect statement of the law; rather, they contend that:

1) The court adequately instructed the jury,

2) The Tatmans did not make proper objection to the court's failure to give the proposed instruction, and

3) If it was error not to give the instruction, the error was harmless.

■ In this opinion we have previously indicated that the jury was not adequately instructed with respect to the law of delivery and acceptance of a deed. Upon the trial court's refusal to give the Tatmans' offered instruction, counsel for the Tatmans said:

"The Plaintiffs object to the refusal of the court to give Instruction H for the reason that one of the issues in this case involves whether a deed was given to satisfy a promissory note. And the jury should be instructed on the requirements for delivery and acceptance of a deed. Otherwise they may be confused."

We believe counsel's objection was sufficient to comply with Rule 51, Wyoming Rules of Civil Procedure, which provides:

" * * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of the objection. * * * *"

The Blakemans argue at length against "plain error" which they contend the Tatmans were asserting. In context we do not think the Tatmans were talking about plain error as discussed in Rule 7.05, Wyoming Rules of Appellate Procedure, when counsel inadvertently used that term. In any event, the plain error doctrine has no application here, as we have determined that the Tatmans made a proper objection in the district court when the court refused to give an instruction on delivery and acceptance.

■ Finally, we are unable to determine that failure to instruct on delivery and acceptance of the deed was harmless error. An instruction on the elements of delivery or a definition of delivery and acceptance was essential to the jury's understanding the key issue between the Tatmans and Blakemans.

**B**

At the end of the Tatmans' case in chief, and again at the end of all the evidence, the Tatmans moved for a directed verdict. These motions were taken under advisement. After the verdict, the Tatmans filed a motion for a judgment notwithstanding the verdict, which was denied. Tatmans' second issue on appeal is the propriety of the court's denial of the motion for a JNOV.

This court has previously set out the rules we must follow in determining the propriety of granting or denying a motion for a directed verdict or for a JNOV.

"In reviewing the grant of a directed verdict by a trial court, consideration must be given to all evidence favorable to [the] party against whom the motion is directed, as well as to all reasonable and legitimate inferences which might be drawn therefrom. [Citations.] Whether or not the evidence so viewed is sufficient to create an issue for the jury is solely a question of law to be answered by the trial court. That court must determine whether or not the evidence is such that, without weighing the credibility of the witnesses, or otherwise, considering the weight of the evidence, there is but one conclusion as to verdict which men of reason could reach. * * *"
*Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246, 1250 (1977).

The rule of review by this court was reiterated in *Brasel and Sims Construction Co. v. Neuman Transit Co.*, Wyo., 378 P.2d 501, 503 (1963), as follows:

" ' * * * [I]t is the duty of this court to assume that the evidence of the successful party is true, leaving out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful

party every favorable inference which may be reasonably and fairly drawn from it. * * * ' "

■ We have set out the evidence in detail in the forepart of this opinion. In summary, the evidence viewed in a light most favorable to the Blakemans was that the Tatmans stated they intended to become the owners of the Upton ranch, directed the preparation of the deed conveying the property to them, secured the execution and delivery of the deed, claimed ownership of the Upton property, tried to sell the ranch and paid the grazing fees. Tatmans' Motion for a JNOV was properly denied: 1) There was substantial evidence in support of the verdict in favor of the Blakemans; and 2) there were disputed material facts, which disputes were properly submitted to the jury.

## II

In the Cordinglys' appeal from judgment in favor of the Blakemans they contend that the evidence does not support the jury verdict. The Blakemans produced evidence that they were reluctant to get involved in the purchase of the Upton ranch, but that they succumbed to the importunity of the Cordinglys and obligated themselves to the Tatmans only to accommodate their relatives, the Cordinglys. Further evidence was produced by the Blakemans that they made a $48,000 down payment to the Tatmans, accepted a deed to the Upton property, and executed a note in the sum of $144,000, which was secured by a mort-

gage on the ranch. According to the Blakemans, the Cordinglys orally agreed to reimburse the Blakemans for the $48,000, and assume and pay the annual installments on the promissory note. The Cordinglys were to receive a deed to the Upton ranch from the Blakemans. Apparently, the oral agreement described by the Blakemans did not specify precisely when the $48,000 was to be paid to them, nor was it specified when they would give a deed to the Cordinglys. The Blakemans produced some evidence from the Cordinglys and nonparties that could be interpreted as corroborating testimony regarding the alleged oral agreement.

At the conclusion of the Blakemans' case in chief on their cross-claim against the Cordinglys, and again at the conclusion of the entire case, the Cordinglys made a motion for a directed verdict.[1] Both motions were based on the contention of the Cordinglys that there was no writing or memorandum, and that if there was any agreement, it was only oral.[2] The Cordinglys did not make a motion for a JNOV.[3]

It appears that the agreement Blakemans described runs afoul of the statute of frauds. Section 1–23–105, W.S.1977, 1985 Cum.Supp., states in part:

"(a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof, be in writing and subscribed by the party to be charged therewith.

---

1. Rule 50(a), Wyoming Rules of Civil Procedure:

   *"Motion for directed verdict; when made; effect.*—A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. * * * "

2. Actually, in their motion for a directed verdict Cordinglys talked about the "statute of limita-

tions." In context it is clear, however, that they were talking about the statute of frauds. Among other things, they cited the applicable statute of frauds section.

3. Rule 50(b), Wyoming Rules of Civil Procedure:

   *"Motion for judgment notwithstanding the verdict.*—Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the moving party may move not later than ten (10) days after the entry of judgment to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict. * * * "

"(i) Every agreement that by its terms is not to be performed within one (1) year from the making thereof;

"(ii) Every special promise to answer for the debt, default or miscarriage of another person;

   \*     \*     \*     \*     \*     \*

"(v) Every agreement or contract for the sale of real estate, or the lease thereof, for more than one (1) year."

The Blakemans' evidence was deficient in that a valid agreement with the Cordinglys was not proved. No attempt was made to prove a note or memorandum; in fact, all parties agreed that the entire alleged agreement was oral. The Blakemans contend, however, that their agreement with the Cordinglys was excepted from the statute of frauds. We disagree.

On December 10, 1980, the Blakemans signed a note promising to pay the Tatmans $144,000 with interest. It was never disputed by the Blakemans that this was a valid debt owed by the Blakemans to the Tatmans.[4]

According to the Blakemans' testimony the Cordinglys not only agreed to reimburse them for the $48,000 down payment, but the Cordinglys also agreed to assume and pay the obligation they had to the Tatmans. According to § 1–23–105(ii), W.S.1977, 1985 Cum.Supp., a promise to answer for the debt of another is void unless memorialized by "note or memorandum," in writing and subscribed by the party to be charged. This provision of the statute of frauds was not complied with.

Section 1–23–105(i) is also applicable to the alleged agreement between the Blakemans and the Cordinglys. Such agreement was not to be, and could not be, performed within one year. The promissory note to

the Tatmans, which the Blakemans contend the Cordinglys agreed to assume and pay, provided:

"Makers reserve the right to prepay any or all of the unpaid balance at any time after three (3) years from date hereof."

By the terms of the alleged oral agreement between the Blakemans and the Cordinglys, the note which the Cordinglys were to assume was not to be paid within a year and could not be paid before December 10, 1983.

The Blakemans contend that their agreement with the Cordinglys was an agreement for reimbursement rather than an agreement for the sale of real estate, and therefore, § 1–23–105(v) does not render such agreement void. We need not address that contention. because we hold that the agreement is void and unenforceable according to the provisions of §§ 1–23–105(i) and (ii).

The situation here is not merely the Blakemans' failure to prove a valid contract, nor the Cordinglys' failure to prove a defense, but rather, it is a case where the Blakemans proved a void contract. Nothing was done nor could be done to breathe life into a void agreement.

Deficiency in proof is not cured by failure to make a motion for a JNOV. When, as here, a motion for a JNOV was not made, the consequences on appeal are not entirely clear. There is hardly any authority to reverse the case and dismiss the defendant. Of some guidance are federal cases which have been decided under Rule 50(b), Federal Rules of Civil Procedure, which is similar to our Rule 50(b), W.R. C.P.[5] In *Johnson v. New York New Haven & Hartford Railroad Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952), when the

---

**4.** The fact that a jury in April, 1984, found that this debt had been satisfied is of no consequence in this portion of the appeal.

**5.** Rule 50(b), Federal Rules of Civil Procedure, 28, U.S.C.A., stated:

"Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the

jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict \* \* \*."

evidence was all in, the railroad moved to dismiss the complaint and for a directed verdict. After the verdict the railroad made several motions but did not move, within ten days after the verdict, "to have judgment entered in accordance with his (its) motion for a directed verdict." The court in Johnson held:

"On several recent occasions we have considered Rule 50(b). We have said that in the absence of a motion for judgment notwithstanding the verdict made in the trial court within ten days after reception of a verdict the rule forbids the trial judge or an appellate court to enter such a judgment. * * *" *Id.,* 344 U.S. 50, 73 S.Ct. 126–127, 97 L.Ed. 81.

"Respondent made a motion to set aside the verdict and for new trial within the time required by Rule 50(b). It failed to comply with permission given by 50(b) to move for judgment n.o.v. after the verdict. In this situation respondent is entitled only to a new trial, not to a judgment in its favor. * * *" *Id.,* 344 U.S. 54, 73 S.Ct. 128, 97 L.Ed. 83.

In *Jackson v. Seaboard Coastline Railroad Company,* 678 F.2d 992, 1021 (11th Cir.1982), the court said:

" * * * Their failure to file a motion for JNOV is not fatal to their appeal. A party's failure to move for JNOV does not preclude appellate review of an earlier motion for a directed verdict. However, where a motion for JNOV has not been filed, the only relief a party may obtain in this court is the ordering of a new trial; we may not direct a district court to enter judgment for the appellant. [Citations.]"

See also, *United States v. Valdosta-Lowndes County Hospital Authority,* 696 F.2d 911 (11th Cir.1983); *Gorsalitz v. Olin Matheson Chemical Corp.,* 429 F.2d 1033 (5th Cir.1970), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *York-*

*shire Indemity Co. of N.Y. v. Roosth & Genecov Production Co.,* 252 F.2d 650 (5th Cir.1958).

 The federal cases we have cited hold that where no motion was made for a JNOV, as in this case, a new trial should be granted. Although the rationale of this federal rule is not entirely clear, we are inclined to follow the procedure in the federal courts since their rule is similar to ours.[6]

Both the Tatmans-Blakemans case and the Cordinglys-Blakemans case are reversed and remanded for a new trial.

---

6. In *Garman v. Metropolitan Life Insurance Co.,* 175 F.2d 24, 28 (3rd Cir.1949), the court said: "If the defendant after judgment had moved for judgment in its favor in accordance with its motion for directed verdict we could remand the case with directions to enter judgment for the defendant. Such a motion not having been made, however, the case must be remanded for what under the circumstances would appear to be the useless formality of another trial."